May it please the court, Cheryl Gordon-McLeod on behalf of Pete Kott. This was a tapes case, as this court is aware. There were 56 tapes, but they had something for both sides on those tapes. For the government, of course, they had the actual hand-to-hand delivery of the $1,000 check, and they had discussion of the pole, the flooring, $7,993 check, the Barbados for the pipeline stuff, and they had them strategizing on the voting. For the defense, however, they had Bill Allen actually saying on tape 36A, after handing Pete Kott the check and saying, here's my check, he said, quote, you don't owe me blank, meaning you don't owe me anything, close quotes, for that check. They had the tape showing agreement on politics and a variety of other things, thus undermining any incentive that Pete Kott would have had to succumb to bribery or extortion, and they showed drunkenness and joking, thus showing that discussions of Barbados for a pipeline could be jokes. Finally, the tapes lacked something critical, and that was the mental state that the government had to prove. They did not show anything about quid pro quo, official act, inducement, or influence on the $5,000, the $1,000, the pole, or the $7,993. In fact, they didn't have the $5,000 on there at all. So it all comes down to interpretation of what was on those tapes. The government's interpretation, of course, is that this was done, the exchanges were done as quid pro quos with corrupt intent. The defense, therefore, had to show two things to counter that. One, how the informant testimony changed over time to undermine it, and two, why the informant testimony might have changed over time, what incentive there might be. The defense obviously could not do that effectively at the time of trial. Now, with the suppressed evidence, even with just the portion of it that we've received, and of course what we've out there, because we have Agent Kepner saying in a statement that she didn't write down the bad stuff when Bill Allen was being interviewed, and it didn't go well, she didn't write it down. But even with the universe of stuff that we have access to now, we now know why Bill Allen had a motive to lie, and this was something that defense counsel didn't know. The story that defense counsel could have told with this evidence is completely different than the story that came out of trial. This is a story of Bill Allen's desperate motive to curry favor, to avoid revelation as a sex predator. And there's four chapters in this story according to the documents that we've received. Chapter 1 is the years 1994 to 2000, and that's Bill Allen's predatory sex with kids, with minors. And that's in Third Supplemental Excerpt of Record, or TSER 352 and 358. That's Chapter 1, 1994 to 2000. Chapter 2 is the year 2000. What happened in the year 2000 according to the documents is that Bill Allen solicited perjurious denials of this unlawful predatory sex with kids. That he did it with two victims, and we have evidence from the documents showing that one victim acquiesced and the other victim did not. That's 1999. The next chapter is in the year 2004, and we're on four separate dates in 2004. We have documents showing that... Claude, you don't have that much time, but you seem to be presenting this as if this is our, like, ab initio decision to make. Aren't we reviewing what Judge Sedgwick did? And isn't it really, you know, you presented this whole story to him, and he came to the trial. Isn't that what you have to attack? Yes, Your Honor, but I'm attacking it with you reviewing it de novo, because the decision he made was based on materiality and lack of admissibility, both legal conclusions that you review de novo. And what I'd like to show by telling this story is just how material this evidence would have been for trial counsel to have used. The third chapter shows that the government discovered solicitation of perjury on Bill Allen's part, and it shows that the government believed it. The assistant U.S. attorney who filed documents in 2004, four days after a meeting with child victim number one, when child victim number one said, Bill Allen asked me to go to his lawyer and sign this document to say we never had sex, the government apparently believed it, because they filed that document in the Boehm case that I submitted last week and asked this court to take judicial notice of, where they're arguing that child victim one is the truth teller, and Bill Allen, they say, was saying things that were factually unsupported. So they endorse in 2004 the version that Bill Allen solicited perjury to cover up sex. But then they turn around in 2004 and give a stop work order to the Alaska Police Department, don't investigate this anymore. They follow up with this really curious March of 2007 302, on which Agent Kepner quotes Bill Allen as saying, I have never made a false statement under oath or encouraged anyone else to do so. And then in September of 2008, after the COT and the Coring Trials, the government writes a letter to Senator Stevens' lawyers saying, well, we've heard a rumor that there was solicitation of perjury on Bill Allen's part, and we've checked through all of our files, and we find, quote, no suggestion that Bill Allen asked child victim one to make a sworn statement. This is a letter signed by some of the same lawyers, at least one of the exact same lawyers, who wrote the 2004 pleading, which said the exact opposite. In 2004, he said, Bill Allen solicited child victim one's perjury. So, yes, I am asking you to take a different take on this than the district court did. The district court said, yes, it's important, and yes, Bill Allen was a key government witness. Otherwise, they never would have bothered calling him with all of his baggage. But the district court went on to say this stuff was inadmissible under 403 and inadmissible under 608B. Now, the 403 ruling, you reviewed de novo. One, because this is a Brady and supervisory powers issue. Two, because there was no evidentiary hearing in the district court, so no deference is owed to any district court judgment about presentation of evidence. Three, because he did hold an evidentiary hearing. No, Your Honor, he denied us an evidentiary hearing. We did not have an evidentiary hearing on any of this. We're going strict. And besides, you see, I'm troubled with that ruling in this sense. It's not really a 403 ruling, right? He's saying, well, if this came up in trial, I would pause the exclusion under 403. I'm not sure what to make of that, you know, the excluding analogy. Agreed. Agreed. It's sort of a hindsight post hoc determination on it. As a legal ruling, it's legally erroneous. Under Lind, the Lind v. Murphy case that I used in the briefs where there was pretty much the exact same kind of dirt on the key witness, the Seventh Circuit ruled that sex crimes and the desire to cover them up certainly give a motive to curry favor to a witness that the defendant has a constitutional right to bring out. And the other key case on that is U.S. v. Abel, the U.S. Supreme Court case, the prison murder case. That's the one where the government called the witness to say, oh, that defense witness, he's a member of the Aryan Brotherhood. Can't get much more prejudicial than that. And as a member of the Aryan Brotherhood, which subscribes to perjury to help their members, he would have lied in this court. Well, I think predatory sex conduct is pretty much up there in terms of prejudice with Aryan Brotherhood. And yet the Supreme Court ruled the government had an absolute right to bring that in to test the bias of the witness. And, of course, the government doesn't even have the Sixth Amendment confrontation right that we have there. So the 403 ruling of the district court, I think we can set aside. The 608B ruling of the district court was that it barred use of extrinsic evidence to attack the truthfulness, extrinsic evidence of specific instances of the crime. Well, of course, that wouldn't bar cross-examination. Of course, evidence doesn't have to be substantively admissible to be considered Brady evidence. And, of course, here we have the impeachment by contradiction problem. That's the fact that 608B does not bar impeachment by contradiction if the contradiction is not collateral. And what do we have Bill Newman eliciting this? He says, I'm a truth teller. I've always told them the truth. And in terms of what he cared about most, he said, I cared most about my kids and my corporation and I didn't care what happened to me. That was their direct evidence. We didn't elicit it on cross. The defense didn't elicit it on cross. Therefore, impeachment by contradiction on that would have been permissible. The time does go quickly. Let me turn to the question of remedy. Given the fact that — Well, before you get to your question, though, what difference would all this have made? Well, I agree that that's a question for the Brady issue, and I agree that that's a question for the NAPU issue. It's not as much of a question for the supervisory powers issue. Under U.S. v. Chapman, this court's decision from 2008, this court can dismiss a case for egregious government misconduct even where there's no due process violation, meaning, as Chapman said, even where there's not the same amount of proof of materiality as is and the Chapman case even said, sure, we can do it for intentional conduct, misconduct, and we can't do it for negligent misconduct, but we can sure do it for recklessness, reckless misconduct. So, yeah, I agree materiality is important, but it's not as important for the supervisory powers argument. The materiality is that taken all together, all of the evidence of Bill Allen's motive to lie would have allowed the defense to show an entirely different story about why he testified as he did, and his testimony was critical to interpreting the tapes. The other aspect of why it's material is because of the actual inconsistent statements on the counts that were charged. For example, we have Bill Allen and Rick Smith testifying at trial that Pete Cott extorted me, but we have Bill Allen's prior statement two days beforehand to two of the trial lawyers saying, quote, Pete Cott never extorted me. That's third supplemental excerpts of record at 360. Now, I understand that the government and I are taking different positions on what the cases say about whether somebody really would know about what extortion means. Factually, though, in this case, the Brady documents suggest that Bill Allen knew exactly what it meant, because we have a document, which is third supplemental excerpt of record 331, handwritten notes of a debriefing, seems like a debriefing of Rick Smith, not sure who took the notes, saying, quote, extortion, legal difference between blackmailing and extortion by an official. Don't concede that it wasn't extortion. So that's an actual inconsistent statement made two days beforehand after the witness had gone through a year of prep, preps in which we now have proof that the government was explaining the legal meaning of extortion. With a record like this, I think we are entitled to dismissal. But I ask the court to keep in mind that the record remains incomplete. Agent Kepner stated in Joy Document 820, which you don't have because the government didn't give it to me, that she didn't write down the bad stuff of what Bill Allen said. And we only got the written stuff. So there's probably more bad stuff out there. In addition, we know there's ongoing investigations out there, including by the independent prosecutor, Mr. Schuelke, the Office of Professional Responsibility, and the IG. So, Your Honor, even on this record, dismissal is required. But I urge you to keep in mind that this record, by the documents we've been given, is woefully incomplete. Thank you, Counsel. Thank you, Your Honor. May it please the Court, my name is Peter Kosky and I represent the United States. On June 10, 2009, this Court granted the government's motion to remand the case to the District Court based on the government's representation that it found information that appeared to be favorable to the defendant but was not disclosed pre-trial. The remand order instructed the District Court to make findings on three issues. First, did the government fail to disclose pre-trial information that was favorable to the defendant? Second, if the answer to the first question is yes, was any of that favorable information material? Meaning, according to the Supreme Court in United States v. Bagley, does any of that favorable information raise a reasonable probability that it would have undermined the outcome of the proceedings? And third, if the answer to the first two questions is yes, then what's the appropriate remedy? Well, I think it's important to begin by conceding what I hope is obvious by the government's brief and by the position that the government took with the District Court below. The government failed in this case to turn over information that was favorable to the defendant pre-trial. But that is where the analysis begins. It is not where the analysis ends. And I think a fair review of the newly disclosed information, particularly in the context of the evidence of the defendant's guilt at trial, demonstrates that the District Court's order denying the defendant's motion to dismiss should be affirmed. Mr. McLeod, you know, suggested that, although our order, I think, remanding the District Court was, I think, you know, was only looking at the Brady issues. Ms. McLeod suggested that this is an appropriate candidate for, you know, exercising supervisorial authority, you know, because of the government misconduct. Was that issue brought up before the District Court at all? It was, and that's the same issue that the District Court rejected when it was made below. And for good reason. I mean, Justice Schema, as you know, this remand order was limited. The remand order specifically says that it's a limited remand based on the discretion of the District Court to give any instructions to the government as to exactly what they should do. The government said that they had material that they would turn over. Has the government fully considered this record in terms of the misconduct by the government? Because certainly in the Stevens case, they decided that the prudent thing was to concede error. And I have tried to look at this case through the same lens, and it's pretty sordid. Yeah. There are a couple of points I want to make with respect to that issue, Judge Fletcher. I think the fact that the government moved on its own to dismiss the case in Stevens, I think, gives us a little more credibility in our position here that we're willing to fight for the conviction of Defendant Cott. They're completely different cases. The evidence against Cott, as described by the District Court, was overwhelming. Well, you know, I have looked at this record, and exactly what did the government offer? What did Cott receive? On that record, I thought, well, let's say down the road, Cott comes in and says, okay, I'm ready for my job. Is there any reason that Vesco would have to have given him a job? Certainly there's no contract there, a lot of vague talk, and a lot of joking. There are two points that I want to make. First, the tapes themselves, the 56 audio and video tapes, which captured the defendant's criminal conduct in real time, established that he had corrupt conversations with Bill Allen and with Rick Smith in which the following exchanges took place. So you think you can win this case on the tapes alone without the testimony of Mr. Allen? Absolutely, Your Honor. Yes. Bill Allen, the District Court found, was one of the three principal witnesses. The District Court found that Bill Allen, Rick Smith, and Pete Cott were the principal witnesses at trial. But the District Court also said that the most significant evidence at trial were the 56 audio and video tapes. But keeping in mind Bill Allen's testimony, Bill Allen did not testify about anything of significance to the defendant's guilt that was not corroborated either by one of the 56 audio and video tapes or by documentary evidence, such as the extra $8,000 inflated amount that went from Vesco, not from Bill Allen, but went from Vesco to Pete Cott and then went directly from Pete Cott to his son. So Bill Allen's testimony with respect to the defendant's guilt was corroborated by the audio and video tapes, which had the defendant saying things like, I'm willing to lie, cheat, and steal for you. I had to sell my soul to the devil. And immediately Bill Allen responds, I own you, essentially. I own your ass. Also captured conversations between Rick Smith and Pete Cott in which Pete Cott says, you know, I want a job. I want this job with Vesco. And Rick Smith says, you've got a job, now get us a pipeline. I mean, those type of conversations don't depend on the testimony of Rick Smith or Bill Allen. And those types of conversations are what established the quid pro quo and the corrupt intent. Right. But there is, I think there's an argument, I didn't mean to interrupt Judge Fletcher's question, that the tapes, the transcripts, leave some key things out that I think are illuminated by interpretation. And if the interpretation is suspect, then that may pose some problems for you. Yeah. I don't think the defendant has identified anything of significance in the tapes which is dependent upon Bill Allen's interpretation or Rick Smith's interpretation. Ms. McCloud just said, yes, there are tapes, but there's no evidence on the tape of corrupt intent or the quid pro quo. And that's not true. The first thing I want to point out is it's not Bill Allen's intent that's at issue here. It's Pete Cott's intent that's at issue. And Bill Allen never testified at trial about what Pete Cott's intent was. He couldn't. Pete Cott's intent was established by the evidence on the tapes. It was established by the corrupt language that he used. It was perhaps emblazoned with CBC or Corrupt Bastards Club. It was established by these corrupt conversations about a foolproof plan that they could develop so that Pete Cott's son could receive $8,000 so he could work on his father's campaign. And that money came from VECO. And it was established by Pete Cott continually calling Rick Smith and Bill Allen saying things like, what are my orders? What do I need to do in order to get the PPT passed for you guys? So something else that Ms. McCloud said that I wanted to address was that there was no evidentiary hearing. And I think this is a point that Judge Tashima started to make was that there really was an evidentiary hearing. There was a 14-day trial. And the Supreme Court, it's necessary to evaluate the newly disclosed or withheld evidence in the context of the strength of the evidence at trial. And that's what the district court did here. There was no need to have an evidentiary hearing. Judge Sedgwick is the same judge that presided over Pete Cott's trial. Judge Sedgwick was certainly more familiar with the evidence than any of us who really came on to the case after the trial took place. Do you think that the district court erred in saying that the testimony about all the sex stuff would have to be excluded and was not admissible? That's right, Your Honor. The district court ruled that evidence of, you know, allegations of Bill Allen's sexual misconduct and criminal conduct would be excluded under Rule 403. And the first point I want to make to that is I think that's properly an evidentiary ruling that's entitled to a higher deferential review. It's – I think it's – If we review it de novo, was he right? Absolutely, Your Honor. Even if it's reviewed de novo, no matter what standard of review is applied. How do you keep out the evidence of solicitation of perjury? I think you don't need to keep it out. And, in fact, that's not what the district court ruled. The district court ruled that the defendant would have been entitled to ask a single question, you know, have you ever asked anyone to lie? And the defendant would have been stuck with the answer. The answer presumably would have been no because Bill Allen had denied ever asking someone to lie in the past. And that same individual who initially said Bill Allen asked me to sign a false affidavit later recanted. And so the defendant would have been precluded from proving or introducing any evidence, any extrinsic evidence to establish that Bill Allen had, in fact, asked anyone to lie. So I think the district court made the correct ruling there that the defendant would have at least been entitled to ask that single question, but the defendant would have been stuck with Bill Allen's answer. But going back, Judge Fletcher, to the issue about evidence of Bill Allen's other criminal acts, I don't think there's – the district court ruled that any probative value there would have been substantially outweighed by confusion of the issues, by misleading the jury, and by – it was cumulative because Bill Allen was already a highly impeachable individual. Now, what he – what the district court said was that this testimony would be so salacious that it couldn't come in. Now, that – you could certainly have redacted, done anything necessary to take out what was in the district court's eyes salacious. Well – That whole exchange there is quite questionable in my mind. Well, the district court said more than that. Of course, to – It said a lot. That's right. It said a lot. And, you know, in order to introduce evidence to impeach a witness, that evidence needs to either go to the witness's credibility, which I don't think anyone has argued this type of evidence goes to Bill Allen's credibility, and I think that's what the district court said. Well, it does to a certain extent. It says – I mean, the theory is that he was currying favor with the government because he wanted to cover up these crimes. I mean, that's the theory. It's not just the fact of the crimes themselves. That's right. It goes to his bias, and that's the second way in which it can be introduced as evidence. I think the reason why it doesn't go to – I'm not coming in over that theory. No. I think that's where the district court made the correct decision in excluding it because it was overly cumulative. Bill Allen was not – unlike the witness in the Lynn case in the Seventh Circuit, Bill Allen was never presented to the jury as an individual with high integrity. Bill Allen had already pled guilty to engaging in acts of corruption. He had already admitted, and it had come out at trial, that he was involved for a number of years in bribing public officials. But he was presented as telling the truth on these critical issues. Well, his – I think it's important not to overvalue his role or overstate his role in the trial. Bill Allen really provided a narrative of the video and audio tapes. The way the – his testimony played out is, you know, the government would show one of these 56 audio or video tapes, which captured the defendant's criminal conduct in real time, and then there would be a pause, and Bill Allen would sort of provide the narrative about what was going on. This goes back to my original point, that there's nothing Bill Allen testified about that was of significance to the defendant's guilt that was not corroborated with either audio or video tapes or with documentary evidence. Well, I mean, for example, I'm just looking at one part of the transcript. And what did you mean by the statement, I'll do the same thing for you? Well, if he needed a job, I'd get him a job. I mean, that's – I know you can argue that's cumulative, but also that solidifies the tape. Well, not only is that cumulative, but that doesn't go to Cott's intent. That goes to Allen's intent, which is not an element of the offense. I mean, Bill Allen was not on trial here. Pete Cott was not. No, but I mean, I'm just using that as an example, that you have a tape and then you have somebody said, and this is what this means. I mean, there is that element of his testimony. That's right, but it's – So if you take all of that out, I guess the question is, can the tape stand alone? But Bill Allen was never asked the question, what did Pete Cott mean? He could not have been asked that question because he could not have provided that testimony. But I don't think – I think it would be a mistake to completely discount Bill Allen's testimony here. And the last point – I see my time is running low. The last point that I wanted to make, Judge Fletcher, with respect to this issue about the allegations of Bill Allen's other criminal conduct, is that although the district court made a 403 ruling, I think the district court also made a materiality ruling, although it wasn't explicit. And I made this argument in our brief, which is that Rule 403 is – it has a disposition towards admissibility, whereas the Supreme Court's Bagley materiality analysis has opposite disposition, where it's, you know, something is material only if it raises a reasonable probability that the outcome of the proceeding would have been different. Now, that's a much more conservative standard than Rule 403. So if the district court rules that this evidence were inadmissible under Rule 403, then I think it logically follows that the evidence is also not material, that the defendant was not prejudiced by it. I see that my time has run out. If I could have just 30 seconds to conclude. Sure. Throughout these proceedings, the district court described the evidence of the defendant's guilt as overwhelming and very substantial. And the district court also found that the most significant evidence of the defendant's videotapes, which captured the defendant's criminal conduct in real time. None of that evidence is challenged by the newly disclosed evidence. And for those reasons and the reasons cited in our brief, the government respectfully requests that this court affirm the district court's denial of the defendant's motion to dismiss. Could I ask a question? Sure. Absolutely. There are at least two other collateral proceedings still going on. There might be others, but there's still an OPR inquiry, right? Is that still going on? There is. It's public knowledge that an OPR and a special counsel are investigating the Stevens trial team. All I can represent about that is that we don't know what the parameters of those investigations are, but those investigations are, by all accounts, thorough. And there are procedures which have been put in place to make sure that if any information which would be favorable to defendant Cott or defendant Coring is found in the course of those investigations, that they would then be filtered through to us so that we can turn them over. But you know when they're supposed to conclude those investigations? Unfortunately, I don't know when those are expected to conclude. Thank you. Any further questions? Thank you, counsel. I thought I would give you a couple minutes. Thank you, Your Honor. I really just wanted to make two factual points. The first is in response to the government's argument that Bill Allen didn't say anything in his testimony about Pete Cott's intent. I'd like to call your attention to excerpt of record. This is the first one from the first appeal, ER page 250, where Rick Smith is being questioned and he says, quote, because of the financial support we'd given Pete that we should be able to influence Pete's work in the legislature, close quote. And then I'd call your attention to that same ER, pages 215 to 216, where Bill Allen is being questioned about the meaning of similar statements on the tape. And he says, quote, get her done, close quote, means job for the pipeline. So that's just one example about the government's witnesses affirmatively testifying about what Pete Cott's intent was. The other factual correction I wanted to make is the government's statement that child victim one recanted anyway, so it didn't matter. Actually, in 1999, she made the allegations. In 2004, she reaffirmed the allegations, and the government apparently believed them because they argued them affirmatively as truth in the Boehm case. She did recant. The date is October of 2007, and you can find that at APD 67 and 59, which I can't give to you because they didn't give them to me. That was after the Cott trial and just on the eve of the Coring trial, so it raises a red flag anyway in terms of why the trial government prosecutors in this case would have had that rush meeting with her right at that point. Thank you, counsel. Thank you. Any questions? Thanks. Could I ask the government a question, though? You know, we have a ‑‑ I just remembered. There's a motion to take judicial notice filed by the defendant. Do you oppose that motion? Well, what I'd like to point out about that motion is the ‑‑ Well, do you oppose it or not? That's a yes or no. No, we don't oppose it. We don't oppose it, but if I could have just 30 seconds to say something about it. Well, not unless you want a rebuttal from the defendants, because we're going to have to give her a chance to argue what the significance is. Well, nobody wants that. All right. If we could just have an opportunity to respond in writing. Well, you can always do that. Okay. Thank you. We'll take judicial notice of the document. Thank you very much.
judges: Fletcher B. , Tashima, Thomas